# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 18-3089-GW(FFMx) | Date | August 27, 2018 |
| Title | *Katrina Morris v. Camden Development, Inc.* | | |

Present: The Honorable **GEORGE H. WU, UNITED STATES DISTRICT JUDGE**

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Elizabeth Parker-Fawley | Brandon R. McKelvey |

**PROCEEDINGS:** DEFENDANT'S MOTION TO DISMISS AND STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT [13];

PLAINTIFF'S MOTION TO REMAND PURSUANT TO 28 U.S.C. § 1447 [16]

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court would grant the Motion to Remand and remand the case to the Superior Court. As such, the Court does not rule on Defendant's Motion to Dismiss the First Amended Complaint.

The Court sets a status conference for October 1, 2018 at 8:30 a.m., or set for January 14, 2019 at 8:30 a.m., if appeal is filed.

: 11

Initials of Preparer  JG

I.      **Background**

Plaintiff Katrina Morris initiated this purported class action against Defendant Camden Development, Inc., on March 9, 2018, in the Superior Court of California, County of Los Angeles. *See generally* Complaint, Docket No. 1, at 21-47 of 47. Plaintiff's Complaint alleged ten causes of action for violations of: (1) California Labor Code §§ 510 and 1198 (unpaid overtime); (2) California Labor Code §§ 226.7 and 512(a) (unpaid meal period premiums); (3) California Labor Code §§ 226.7 (unpaid rest period premiums); (4) California Labor Code §§ 1194, 1197, and 1197.1 (unpaid minimum wages); (5) California Labor Code §§ 201 and 202 (final wages not timely paid); (6) California Labor Code § 204 (wages not timely paid during employment); (7) California Labor Code §§ 226(a) (non-compliant wage statements); (8) California Labor Code § 1174(d) (failure to keep payroll records); (9) California Labor Code §§ 2800 and 2802 (unreimbursed business expenses); and (10) California Business & Professions Code §§ 17200, *et seq.* (California's Unfair Competition Law or "UCL"). *See generally id.* In her Complaint, Plaintiff sought unspecified damages and injunctive relief on behalf of herself and similarly situated employees in the State of California. *See id.* Defendant removed the lawsuit from the Superior Court, asserting that this Court had jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). *See generally* Notice of Removal ("NOR"), Docket No. 1. Plaintiff moved to remand the case back to the Superior Court, arguing that Defendant had not demonstrated that the jurisdictional amount in controversy is satisfied. *See generally* Motion to Remand ("MTR"), Docket No. 16. Prior to moving to remand, Plaintiff filed a First Amended Complaint (*see* Docket No. 11), which Defendant moved to dismiss in its entirety (*see* Docket No. 13). The Court has deferred ruling of Defendant's Motion to Dismiss until the jurisdictional issue is settled.

On June 18, 2018, the Court heard argument on Plaintiff's MTR and concluded that jurisdictional discovery was necessary. *See generally* Jurisdictional Discovery Order, Docket No. 22. In its Order, the Court described some of the assumptions underpinning Defendant's calculation of the amount in controversy. *See id.* at 8-9. For instance, the Complaint alleges Class Members "worked in excess of eight (8) hours in a day, and/or in excess of forty (40)

hours in a week." *See* Complaint ¶ 52. Additionally, the Complaint alleges "a pattern and practice of wage abuse" (¶ 25) as well as "policies and practices of requiring employees . . . to work overtime without paying them proper compensation" (¶ 114). From those allegations, Defendant assumed that putative class members worked three hours of unpaid overtime per week – a violation rate of 60 percent in a five-day workweek. *See* NOR ¶ 17. Employing that 60 percent violation rate, Defendant calculated that the amount in controversy for Plaintiff's unpaid overtime cause of action to be $1,796,559.55 (19,706.6 workweeks x $20.26 average hourly rate x 1.5 overtime premium x 3 violations per five-day workweek). *See* NOR ¶ 17.

These types of assumptions have been rejected by courts within the Central District of California. *See, e.g.*, *Townsend v. Brinderson Corp.*, Case No. 14-cv-5320-FMO, 2015 WL 3970172, at *6-7 (C.D. Cal. June 30, 2015). However, other courts within the district have accepted similar assumptions. *See, e.g.*, *Torrez v. Freedom Mortgage Corp.*, 17-cv-0867-JGB, 2017 WL 2713400, at *3-4 (C.D. Cal. June 22, 2017). As such, the Court ordered Defendant to produce to Plaintiff the "payroll data" and "payroll records" used by Defendant to calculate the amount in controversy and also to "provide information upon which Plaintiff and the Court may determine how frequently employees worked shifts that were long enough to entitle employees to meal or rest breaks." Jurisdictional Discovery Order at 10.

Pursuant to the Court's Jurisdictional Discovery Order, Plaintiff deposed Sue Wilburn, Defendant's Director of Payroll. *See generally* Wilburn Depo. Tr., Docket No. 29-2. Wilburn submitted a declaration in support of Defendant's NOR. *See generally* Wilburn Decl., Docket No. 1-1. After Plaintiff filed her MTR, Wilburn submitted a supplemental declaration, modifying her calculations in response to arguments advanced in the MTR.[1] *See generally* Wilburn Supp. Decl., Docket No. 19-1.

During the course of her deposition, Wilburn testified that the figures provided to the Court in her initial declaration stemmed from data her "team" pulled from Defendant's payroll software. *See* Wilburn Depo. Tr. at 17:15-20. Wilburn did not review any "raw time data" in preparing her initial declaration. *See id.* at 18:23-25. Wilburn testified to a similar process for the creation of her supplemental declaration. *See id.* at 20:9-19. In her initial declaration, Wilburn stated that "putative class members worked for approximately 98,528 workdays" during

---

[1] For instance, Wilburn's supplemental declaration employs a "weighted average" hourly rate of pay of $19.83 per hour, forty-three cents less than the average hourly rate of pay of $20.26 she employed in her initial declaration.

the putative class period. *See* Wilburn Decl. ¶ 6. In her deposition, Wilburn testified that this figure includes "all paid time" including "vacation, sick and the, you know, paid time off." Wilburn Depo. Tr. at 22:7-16. Defendant's NOR stated that putative class members worked 19,706.6 workweeks during the putative class period. *See* NOR ¶ 17. Wilburn testified that this figure was derived by dividing 98,528 –the number of workdays – by five, due to "the normal schedule" of five workdays per workweek. *See* Wilburn Depo. Tr. at 22:17-22, 23:12-14. The payroll software Defendant employs is capable of determining "the number of workweeks actually worked" but Wilburn and her team did not review that data. *See id.* at 23:19-24:1.

In her supplemental declaration, Wilburn stated that she performed an additional analysis of Defendant's payroll data to determine the number of workdays lasting "more than five hours" that putative class members worked during the putative class period, excluding vacation days, sick days, or paid time off. Using this methodology, the number of workdays decreases from 98,528 to 82,517. *See* Wilburn Supp. Decl. ¶ 6. During her deposition, Wilburn testified that the 82,517 figure includes work days equaling five hours, not only those that lasted "more than five hours." *See* Wilburn Depo. Tr. at 24:11-21.

With regard to the assumed violation rates, Wilburn testified that she has never been responsible for creating the work schedule of any of Defendant's hourly-paid California employees. *See id.* at 42:22-43:1. She did not review any schedules in preparing her declarations, nor did she speak with any of Defendant's California-based employees in doing so. *See id.* at 43:2-7. Wilburn knows that members of the putative class have worked overtime during the putative class period, but reviewed no records to determine whether Defendant paid overtime wages. *See id.* at 43:20-24. She undertook no inquiry or effort to determine whether putative class members have worked overtime for which they have not been paid. *See id.* at 45:15-19. In preparing her declarations, Wilburn reviewed no documents describing Defendant's policies or practices with respect to premium payments for rest or meal periods. *See id.* at 51:7-11. She reviewed no information showing how frequently putative class members missed meal periods (*id.* at 63:3-7), were required to take meal periods at a time later than required by law (*id.* at 63:8-13), or were required to take shortened meal periods (*id.* at 63:14-19). Similarly, she reviewed no information to show how frequently putative class members missed rest periods (*id.* at 64:3-8), were required to take shortened rest periods (*id.* at 64:9-12), or were required to take rest periods at a time later than required by law (*id.* at 64:13-14).

3

Finally, Wilburn reviewed no information to show how frequently putative class members performed overtime work for which they were not paid (*id.* at 64:15-19) or work for which they were not paid the minimum wage (*id.* at 64:20-24).

After Wilburn's deposition, the parties filed supplemental briefs. *See* Plaintiff's Supplemental Brief in Supp. of MTR ("Plaintiff's Supplemental Brief"), Docket No. 29; Defendant's Supplemental Brief in Opp'n to MTR ("Defendant's Supplemental Brief"), Docket No. 30. Defendant additionally submits a third declaration from Wilburn, ostensibly to further address some of the questions posed by Plaintiff during Wilburn's deposition. *See generally* Wilburn Second Supp. Decl., Docket No. 30-3. Wilburn again slightly modifies the figures she previously reported to the Court in response to Plaintiff's scrutiny. *See id.* ¶ 6 ("During my deposition on July 18, 2018, Plaintiff's counsel asked about certain data queries related to calculating workdays. I have attempted to have my staff run some of these queries. My further analysis of [Defendant's] timekeeping data and payroll revealed that putative class members (defined as all non-exempt, hourly employees in California) worked a total of 64,013 workdays that included at least 8 hours of work time, from March 9, 2014 to March 20, 2018. My further analysis also revealed that putative class members worked a total of 81,677 workdays that included at least 6 hours of work time, and 83,953 workdays that included at least 3.5 hours of work time, from March 9, 2014 to March 20, 2018.").

## II.   Legal Standard

A defendant may remove a civil action filed in state court if the action could have originally been filed in federal court. 28 U.S.C. § 1441. A plaintiff may seek to have a case remanded to the state court from which it was removed if the district court lacks jurisdiction or if there is a defect in the removal procedure. 28 U.S.C. § 1447(c). Defects in the removal procedure must be timely raised or will be deemed to be waived. *See N. California Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1038 (9th Cir. 1995). However, a district court must remand the case if it appears before final judgment that the court lacks subject matter jurisdiction. 28 U.S.C. § 1447(c). The burden of establishing federal jurisdiction for purposes of removal is on the party seeking removal.[2]  *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115,

---

[2] While normally there is a "strong presumption" against removal jurisdiction (*see e.g. Gaus v. Miles. Inc.*, 980 F.2d 564, 566 (9th Cir. 1992)), and doubts as to removability are resolved in favor of remanding the case to state court (*Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003)), "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal

1117 (9th Cir. 2004).

CAFA provides that district courts have original jurisdiction over any class action in which: (1) the amount in controversy exceeds five million dollars, (2) any plaintiff class member is a citizen of a state different from any defendant, (3) the primary defendants are not states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief, and (4) the number of plaintiffs in the class is at least 100. 28 U.S.C. §§ 1332(d)(2), (d)(5). The amount-in-controversy requirement excludes only "interest and costs," so attorneys' fees can be included in the calculation. *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696, 700 (9th Cir. 2007).

"[U]nder CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction." *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 685 (9th Cir. 2006). Thus, a removing defendant bears the burden to establish that a court has jurisdiction over removed claims. *See id.* The propriety of removal is usually determined solely on the basis of pleadings filed in state court. *Williams v. Costco Wholesale Corp.*, 471 F.3d 975, 976 (9th Cir. 2006).

When measuring the amount in controversy, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint. *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 1001 (C.D. Cal. 2002). "The ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will actually owe." *Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1205 (E.D. Cal. 2008); *Rippee v. Boston Market Corp.*, 408 F. Supp. 2d 982, 986 (S.D. Cal. 2005). However, "[c]onclusory allegations as to the amount in controversy are insufficient."[3] *Matheson*, 319 F.3d at 1090-91. Rather, "a court may consider the contents of the removal petition and 'summary-judgment-type evidence' relevant to the amount in controversy at the time of the removal." *Valdez*, 372 F.3d at 1117. A court may also consider supplemental evidence later proffered by the removing defendant, which was not originally included in the removal notice. *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 n. 1 (9th

---

court." *Dart Cherokee Basin Operating Co., LLC v. Owens*, ___ U.S. ___, 135 S. Ct. 547, 554 (2014).

[3] Additionally, neither the named plaintiff nor his/her counsel may attempt to avoid CAFA removal by stipulating that the class would seek less than $5 million in damages. *See Std. Fire Ins. Co. v. Knowles,* 568 U.S. 588, 592-93 (2013).

Cir. 2002). "Under this system, a defendant cannot establish removal jurisdiction by mere speculation and conjecture, with unreasonable assumptions." *See Ibarra v. Manheim Inv., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015).

III. **Discussion**

The Court's Jurisdictional Discovery Order discussed *Ibarra* in detail. *See* Jurisdictional Discovery Order at 5-6. To briefly review, in that case the Ninth Circuit rejected a defendant's assertion regarding the amount in controversy because it was calculated by assuming that defendant universally violated California labor laws. *See Ibarra*, 775 F.3d at 1199 ("While it is true that the complaint alleges that [defendant] maintains 'an institutionalized unwritten policy that mandates' the employment violations alleged in the complaint, including the denial of meal and rest periods, this does not mean that such violations occurred in each and every shift."). The Ninth Circuit remanded the case to the district court to permit "both sides to submit evidence related to the contested amount in controversy." *Id.* In so doing, the Ninth Circuit noted that:

> [Defendant] relied on an assumption about the rate of its alleged labor law violations that was not grounded in real evidence. [Plaintiff] contested the assumption, but did not assert an alternative violation rate grounded in real evidence, such as an affidavit by [plaintiff] asserting how often he was denied meal and rest breaks. We remand on an open record for both sides to submit proof related to the disputed amount in controversy, and the district court must then determine if a preponderance of the evidence shows that the amount in controversy exceeds $5 million, *Dart*, 135 S. Ct. at 553-54. [Defendant], as the removing defendant, has the burden of proof on this. *Abrego Abrego*, 443 F.3d at 684. Under the preponderance of the evidence standard, if the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction.

*Id.*

Here, Plaintiff disputes the manner in which Defendant collected information and quibbles about the number of workdays and workweeks Defendant asserts are at issue. *See* Plaintiff's Supplemental Brief at 3 ("Ms. Wilburn stated that putative class members worked for approximately 98,528 workdays during the relevant period. In fact, this number was for all days paid, including paid time off, not days worked, and led to overinflated calculations in Defendant's Notice of Removal.") (internal quotation marks, citation, and emphasis omitted). Defendant responds that the Plaintiff's proposed method of calculating the number of workdays does not meaningfully impact the calculations. *See* Defendant's Supplemental Brief, Docket No.

6

30, at 6 (Defendant's "revised calculations, based on the numbers that Plaintiff's counsel requested, only reduce the amount in controversy by 4.4% to 5.5%. Even using all of Plaintiff's suggestions and assumptions the amount in controversy still well exceeds $5 million."). In the end, however, the number of workdays and workweeks is ancillary to the issue before the Court – whether or not Defendant's assumed violation rates are "grounded in real evidence." *See Ibarra,* 775 F.3d at 1199.

Defendant claims violation rates of 60 to 100 percent for Plaintiff's various causes of action. *See* NOR ¶ 17 (assuming three hours of unpaid overtime per workweek), ¶ 18 (assuming three missed meal periods per workweek), ¶ 20 (assuming three missed rest periods per workweek), ¶ 24 (assuming that every terminated employee was refused wages owed for the entire statutory period of 30 days), ¶ 25 (assuming that every wage statement issued by Defendant was deficient). These assumptions produce an amount in controversy drastically exceeding CAFA's jurisdictional threshold. *See id.* ¶ 26 (asserting at least $5,485,150 in controversy, exclusive of attorneys' fees). However, if the Court changes some of the assumptions underpinning Defendant's calculations and assumes a 20 percent violation rate with respect to Plaintiff's causes of action for meal and rest periods (*i.e.*, putative class members missed only one meal period and one rest period per workweek), the amount in controversy, including Defendant's method for calculating attorneys' fees, comes to $4,891,483, below CAFA's jurisdictional minimum, summarized in the table below.

| Claim | Amount & Calculation |
|---|---|
| Unpaid Overtime | **$1,142,440**<br>12,802.6 workweeks x 3 unpaid overtime hrs per workweek x 1.5 overtime premium x $19.83 weighted average hourly wage |
| Meal Periods | **$323,931**<br>16,335.4 workweeks x *1 meal period violation per week* x $19.83 weighted average hourly wage |
| Rest Periods | **$332,958**<br>16,790.6 workweeks x *1 rest period violation per week* x $19.83 weighted average hourly wage |
| Minimum Wages | **$1,437,591**<br>Calculated by assuming 30 minutes of unpaid minimum wages for each employee on each workday and including statutory penalties. |
| Wage Statements | **$258,250**<br>Calculated by assuming every putative class member who received at least one wage statement received an inaccurate wage statement every pay period for the entire year. |
| Waiting Time | **$418,810**<br>Calculated by assuming that every putative class member that left Defendant's employ during the putative class period was not paid wages due upon termination or within thirty days thereafter. |
| Attorneys' Fees | **$978,495**<br>25% of claimed amounts |
| **Total** | **$4,892,475** |

If the Court tweaks the assumptions again and assumes that the Complaint suggests putative class members worked five hours of unpaid overtime per workweek the amount in controversy increases from $4,892,475 to $5,844,509 and CAFA's jurisdictional threshold would be met.[4] The unmistakable conclusion is that the assumed violation rates are determinative – if the Court assumes universal violations or violation rates approaching universal violations, CAFA's jurisdictional threshold will be met. If the Court assumes lesser violation rates the

---

[4] The Complaint's allegations that putative class members "worked in excess of eight hours in a day, and/or in excess of forty (40) hours in a week" (¶ 52) as a result of Defendant's "policies and practices of requiring employees . . . to work overtime without paying them proper compensation" (¶ 114) would seem to the Court equally amenable to an assumption that putative class members worked five hours of unpaid overtime per workweek as three hours of unpaid overtime per workweek. For that matter, an assumption of 20 hours of unpaid overtime per workweek could also be asserted based on the Complaint's allegations. If the putative class worked 20 hours of unpaid overtime per workweek CAFA's jurisdictional threshold would be satisfied based on Plaintiff's unpaid overtime claim alone (12,802.6 workweeks x 20 unpaid overtime hrs per workweek x 1.5 overtime premium x $19.83 weighted average hourly wage = $7,616,267).

jurisdictional threshold will not be met.

In its supplemental brief, Defendant urges the Court to accept its violation rates because a violation rate of 60 percent with respect to some of, but not all, of Plaintiff's causes of action is "reasonable" as compared to the across-the-board 100 percent violation rate the defendant asserted in *Ibarra*. *See* Defendant's Supplemental Brief at 8-9. The Court would find this argument unpersuasive, however. If Defendant put forth "real evidence" supporting an assumed violation rate of 100 percent, the Court would be required to accept it. *See Ibarra*, 775 F.3d at 1199. Defendant may not escape *Ibarra*'s requirements by simply asserting a lesser violation rate. In other words, the violation rates underpinning Defendant's calculations are either supported by real evidence or they aren't – the evidentiary burden does not decrease proportionally with the violation rates asserted. As the *Ibarra* Court saliently put it: "assumptions cannot be pulled from thin air but need some reasonable ground underlying them." *Id.*

The only evidence before the Court comes from Wilburn. She has now submitted three declarations and was deposed by Plaintiff. While the figures cited in her declarations change with each iteration, her deposition made clear that she did not offer factual support for Defendant's assumed violation rates. She testified that she reviewed no records to determine if Defendant paid overtime wages to putative class members. *See* Wilburn Depo Tr. at 43:20-24. She undertook no inquiry or effort to determine if putative class members have worked overtime for which they have not been paid. *See id.* at 45:15-19. She has no information regarding how frequently putative class members missed meal periods, were offered late meal periods, or were offered meal periods of a duration shorter than required by law. *Id.* at 63:3-19. The same is true for rest periods – she offers no information as to whether putative class members missed rest periods, were forced to take late rest periods, or were forced to take shortened rest periods. *Id.* at 64:3-24. In sum, Wilburn offers no information by which the Court may conclude that Defendant's assumptions were not "pulled from thin air." *See Ibarra*, 775 F.3d at 1199.

Defendant contends that requiring it to justify its assumptions with "potentially . . . damaging liability evidence of actual meal and rest period violations" should not be required to remove a case on the basis of CAFA jurisdiction. *See* Defendant's Supplemental Brief at 9. Defendant's concern is not lost on the Court. "*Dart Cherokee* and *Ibarra* put all involved on the horns of a dilemma: the questions they raise implicate fundamental tensions and evade easy

answers. On the one hand, these cases require a defendant to do more than pull an assumed rate of violation from the ether of generalized allegations of illegal behavior. On the other hand, defendants should not be required to fall on their swords to establish the propriety of removal jurisdiction." *Amaya v. Consol. Container Co., LP*, Case No. 15-cv-3369-SVW, 2015 WL 4574909, at *2 (C.D. Cal. July 28, 2015). As the Court explained in its Jurisdictional Discovery Order, this fundamental tension has resulted in seemingly inconsistent rulings regarding substantially similar issues not only by trial courts within the Ninth Circuit, but also by trial courts in this judicial district. *See* Jurisdictional Discovery Order at 6-8 (collecting cases). In the end, however, the Court may not simply ignore the Ninth Circuit's directive that it should not rely "an assumption about the rate of [defendant's] alleged labor law violations that [is] not grounded in real evidence." *Ibarra*, 775 F.3d at 1199. Here, it is apparent that Defendant's assumptions are not grounded in real evidence as Wilburn alone offers evidence in support of removal, but that evidence says nothing with respect to Defendant's alleged violation rates.

Finally, Defendant argues that the Court should accept its violation rates because Plaintiff has not proposed an alternative. *See* Defendant's Supplemental Brief at 10. Defendant states that "Plaintiff cannot simply sit back and criticize the assumptions without presenting any actual evidence to the contrary." *Id.* The Court would agree that Plaintiff had every opportunity to simply submit an affidavit or declaration as the *Ibarra* court contemplated in that case. *See id.* (remanding to permit an opportunity for plaintiff to "assert an alternative violation rate grounded in real evidence, such as an affidavit by [plaintiff] asserting how often he was denied meal and rest breaks."). Had Plaintiff done so perhaps the Court and the parties would've expended significantly less time and energy on this matter. But in the end the burden of demonstrating jurisdiction is on Defendant, not Plaintiff. *See Abrego Abrego*, 443 F.3d at 684. "Under the preponderance of the evidence standard, if the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction." *Ibarra*, 775 F.3d at 1199; *see also Blevins v. Republic Refrigeration, Inc.*, Case No. 15-cv-4019-MMM, 2015 WL 12516693, at * 5 (C.D. Cal. Sep. 25, 2015) (collecting cases and concluding "the burden of adducing evidence rests with defendant and [] plaintiff need not proffer evidence until defendant has proffered sufficient proof to meet its initial burden" justifying removal). Here, the Court would find that the evidence is in equipoise in that neither side has submitted evidence supporting the alleged violation rates. Given that, the scales tip against federal-court jurisdiction and the Court would

therefore find that it lacks jurisdiction to entertain this lawsuit.  *See Ibarra*, 775 F.3d at 1199; *see also Vilitchai v. Ametek Programmable Power, Inc.*, Case No. 15-cv-1957-L, 2017 WL 875595, at *4 (S.D. Cal. Mar. 6, 2017) ("Where, as here, the evidence is in equipoise, *i.e.*, no evidence on either side, the scales tip against federal-court jurisdiction.") (internal quotation marks omitted); *Stone v. Gov't Emp. Ins. Co.*, Case No. C16-5383-BHS, 2017 WL 9538396, at *1 (W.D. Wash. Oct. 5, 2017) ("[I]f neither party submitted evidence on this issue, then the evidence submitted by both sides is balanced and the scales tip against federal-court jurisdiction.") (internal quotation marks omitted).

IV. **Conclusion**

Based on the foregoing discussion, the Court would grant the MTR and remand the case to the Superior Court.  As such, the Court does not rule on Defendant's Motion to Dismiss the First Amended Complaint.